# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.  1:18-cv-02206-MSK-STV

RICHARD BRANDT GREEN, M.D., an individual,

Plaintiff,

v.

U.S. ANESTHESIA PARTNERS OF COLORADO, INC., f/k/a GREATER
COLORADO ANESTHESIA, P.C., a Colorado corporation, and
U.S. ANESTHESIA PARTNERS, INC., a Delaware corporation,

Defendants.

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

COMES NOW Plaintiff Richard Brandt Green, M.D. ("Dr. Green"), by and through his undersigned counsel, in opposition to the Defendants' Motion for Summary Judgment (# 113) pursuant to Fed. R. Civ. P. 56. Triable issues of fact exist with regard to all of Dr. Green's claims upon which the Defendants seek summary judgment. Rather than establish a lack of disputed issues of material fact, Defendants' 49-page Motion for Summary Judgment instead highlights that there are numerous material disputed factual issues. All of Dr. Green's claims for disability discrimination and retaliation under the Americans with Disabilities Act, the Colorado Anti-Discrimination Act, and the Rehabilitation Act of 1973, as well as his claims for breach of contract, should go before a jury at trial.

## **INTRODUCTION**

Dr. Green is a committed and skilled Board-certified anesthesiologist, whose former colleagues attest to his good experience, reputation, and skill as a medical provider. (Deposition of Peter Harkness, M.D. ("Harkness Deposition), attached as Exhibit 1, pp. 195:10-25; 196:1-15; *see also* Deposition of Barbara Allen, M.D. ("Allen Deposition"), attached as Exhibit 2, pp. 37:825; 38:1-25; 39:1-15; *see also* Deposition of Christopher Strouse, M.D. ("Strouse Deposition"), attached as Exhibit 3, p. 36:22-25).

It is undisputed that Dr. Green did not engage in workplace misconduct or endanger the health and safety of any patients prior to the Defendants' decision to demote him from partnership. Yet, the Defendants' Motion for Summary Judgment attempts to characterize Dr. Green as committing "misconduct" due to his substance abuse disability (alcoholism) and failure to completely abstain from alcohol outside of work per his agreements with the Colorado Physician Health Program ("CPHP"), in order to justify Defendants' discriminatory and retaliatory demotion of Dr. Green. Defendants' Motion is another example of the insidious discrimination and retaliation Dr. Green experienced as a result of his disabilities of substance abuse disorder involving alcohol and Autism Spectrum Disorder ("ASD" or "Autism").[1]

The Defendants' Motion for Summary Judgment falsely accuses Dr. Green of admitting to Defendants' new Human Resources Manager that he sexually harassed a nurse at a hospital facility (he disputes that he made any such admission, nor did the hospital facility make any finding of sexual harassment after its workplace investigation).

---

[1] Addiction is a disease; not a character flaw or a failure of willpower.

And, Defendants incoherently claim that they were justified in terminating Dr. Green from his employment just fifteen (15) days after this lawsuit was filed because he purportedly failed to give "prompt notice" to Defendants of a copy of a letter he received from the Colorado Medical Board, notwithstanding that he voluntarily disclosed to Defendants his receipt of the letter and what it said.

The Defendants' Motion for Summary Judgment further ignores the mutually agreed and defined termination events in the Physician-Partner Employment Agreement and instead, seeks summary judgment based on an alleged failure by Dr. Green to comply with ambiguous language in Section 2.4(ii) (Licensure, Compliance with Laws, Standards) of the Agreement.

Viewing the facts, and all reasonable inferences and doubts, in the light most favorable to the non-moving party, Dr. Green, Defendants' Motion for Summary Judgment should be denied and Dr. Green should be afforded a jury trial on his claims. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

## CHRONOLOGICAL RECITATION OF FACTS[2]

1.      Dr. Green is a board-certified anesthesiologist who has been practicing medicine since 1986. Dr. Green obtained his license to practice medicine in the State of Colorado on April 9, 1992. (Resume & Licensee Information, attached as Exhibit 4).

2.      Since 1992, Dr. Green has been a shareholder with Metro Denver

_____

[2] Plaintiff provides this chronological recitation of facts as permitted by Senior District Judge Marcia S. Krieger's Practice Standard 7.6.2.

Anesthesia, P.C. ("MDA"), which became Greater Colorado Anesthesia, P.C. ("GCA") in 2013. After a merger transaction in 2015, GCA became U.S. Anesthesia Partners of Colorado, Inc. ("USAP-CO"). In total, Dr. Green was a partner/shareholder with the same group for over twenty-four (24) years before Defendants demoted him from partnership. (Harkness Deposition, Ex. 1 at pp. 75:21-25; 76:1-4).

**Dr. Green Suffers From Substance Abuse Disorder Involving Alcohol**

3.      In May 2008, in an attempt to resolve marital problems, Dr. Green self-reported to the Colorado Physician Health Program ("CPHP") regarding his issues with alcohol consumption. After his intake interview and process, CPHP diagnosed Dr. Green with alcoholism and required him to immediately stop practicing medicine and attend an in-patient rehabilitation program. (Deposition of Richard Green, M.D. ("Green Deposition"), attached as Exhibit 5, pp. 84:15-25; 85:1-6).

4.      Dr. Green traveled to Atlanta, Georgia to attend an in-patient rehabilitation program. However, Dr. Green was discharged from the program early and told he "did not get it."[3] Dr. Green found another in-patient rehabilitation program in Virginia, successfully completed that program, and returned to full-time practice with his group (MDA). (*Id.* at p. 92:3-25).

**Dr. Green Relapses Due to Divorce**

5.      In September 2012, Dr. Green's then-wife filed for dissolution of their marriage. In early December 2012, after learning about his wife and her boyfriend traveling with his two young children for the holidays, Dr. Green suffered a relapse of his

---

[3] Dr. Green's difficulty with comprehending the first rehabilitation program can be explained, at least in part, by his later Autism Spectrum Disorder diagnosis, *infra*.

substance abuse disorder involving alcohol and was arrested for suspicion of drinking and driving in Douglas County, Colorado. (Green Deposition, Ex. 4, pp. 193-196).

6.      In March 2013, Dr. Green pled guilty to a misdemeanor DWAI. (Driving Record, attached as Exhibit 6).

7.      In April 2013, the Colorado Medical Board ordered CPHP to perform an evaluation of Dr. Green to determine whether he has any physical or mental illnesses or conditions that might impact his ability to practice medicine with reasonable skill and safety to patients. (Defendants' Ex. B).   CPHP determined that Dr. Green was safe to practice medicine, but he was subject to ongoing monitoring and testing by CPHP.

**2015 Merger Transaction with USAP**

8.      In early 2015, Dr. Green's practice group, GCA, approved a transaction with Defendant U.S. Anesthesia Partners, Inc. ("USAP") to form a new entity, Defendant U.S. Anesthesia Partners of Colorado, Inc. ("USAP-CO") (USAP and USAP-CO are collectively referred to as "Defendants").[4] (Harkness Deposition, Ex. 1, p. 15:2-13).

9.      On February 9, 2015, Dr. Green signed a Vesting and Stockholders Arrangement Agreement (GCA) with U.S. Anesthesia Partners Holdings, Inc. as part of the merger transaction ("VSAA"). (VSAA, attached as Exhibit 6).

10.     On February 10, 2015, Dr. Green signed a 5-year Physician-Partner Employment Agreement and a Retention Bonus Agreement providing him with a cash

---

[4] Defendants are joint employers of Dr. Green. USAP provides administrative and back office support for USAP-CO, including general management, finance, payroll, and human resources functions. In addition, Physician-Partners with USAP-CO are owners of USAP through their stock.

payment upon the closing of the transaction.[5] (Defendants' Ex. A).

11.     Dr. Green also received a letter from Defendants on the same date regarding his statement of USAP shareholdings: 345,052 total transaction shares (319,966 non-escrow purchase price shares and 25,086 indemnity escrow shares). (Letter at GREEN 1846, attached as Exhibit 8).

12.     On April 29, 2015, Defendants entered into a 5-year Professional Services Agreement with HCA-HealthONE LLC ("HCA") d/b/a The Medical Center of Aurora ("TMCA"), Rose Medical Center ("RMC"), Presbyterian/St. Luke's Medical Center ("PSL"), Rocky Mountain Hospital for Children ("RMHC"), and Sky Ridge Medical Center ("SRMC"). (HealthONE PSA, attached as Exhibit 9, p.1). Per the HealthONE PSA, all physicians and other employees of Defendants must "be accepted by HealthONE's Chief Executive Officer and Chief Medical Officer" and "said acceptance may be withdrawn or temporarily suspended immediately by the Facility's Chief Executive Officer or Chief Medical Officer in his or her reasonable discretion at any time with written notice to [Defendants]." (*Id.*)

**Dr. Green Relapses During Mission Trip to Vietnam**

13.     From March 26, 2015 to April 18, 2015, Dr. Green traveled to Vietnam on a volunteer medical mission trip to provide surgical care to underserved populations. During this trip, Dr. Green consumed alcohol. When he returned to Colorado, Dr. Green tested positive for alcohol use by CPHP. (Green Deposition, Ex. 5 at p. 86).

14.     On July 1, 2015, CPHP notified Defendants of Dr. Green's positive alcohol

---

[5] The parties to the Employment Agreement and Retention Bonus Agreement were Dr. Green and GCA. After the transaction closed, GCA became USAP-CO.

test. Neither CPHP nor Defendants took any action with respect to the positive test.

15.     In October 2015, Dr. Green tested positive again for alcohol use by CPHP and Dr. Green admitted to CPHP that he was drinking alcohol episodically since his mission trip.

**Dr. Green's Medical Leave**

16.     On October 27, 2015, Dr. Green notified Defendants of his relapse and that he needed to take a leave of absence.  Defendants removed him from the schedule on October 28, 2015. (Letter, GREEN 1116 at 4, attached as Exhibit 10).

17.     From October 28, 2015 to March 29, 2016, Dr. Green took a medical leave of absence from Defendants. (Email from Dr. Green to Matt Bigalk and Dr. Harkness, dated December 18, 2015, attached as Exhibit 11). He also requested medical leaves of absence from the facilities where he maintained credentials. (Ex. 10).

18.     On November 5, 2015, CPHP issued a report to Defendants and the Colorado Medical Board that Dr. Green had ingested alcohol in contravention of his agreements with CPHP.

**The Colorado Medical Board Temporarily Suspends, Then Reinstates His License**

19.     On November 13, 2015, the Colorado Medical Board issued an Order of Suspension, providing that Dr. Green's medical license would be suspended, effective November 16, 2015, due to Dr. Green's two positive tests evidencing non-compliance with his agreements with CPHP to abstain from alcohol. (Defendants' Ex. B).

20.     On November 18, 2015, Dr. Green and his legal counsel (Carmen Decker, Esq.) appeared at a post-suspension hearing before the Colorado Medical Board to

request reinstatement of his medical license based on his disability of substance abuse disorder involving alcohol, not patient care or safety issues. (Ex. 11).

21.     The same day, the Colorado Medical Board approved lifting Dr. Green's license suspension retroactively effective November 16, 2015, if Dr. Green agreed to sign a 5-year treatment monitoring Stipulation and Final Agency Order ("Stipulation"). Dr. Green signed the Stipulation and his license to practice medicine became unrestricted. (Defendants' Ex. B).

22.     The Colorado Medical Board notified the hospitals and surgery centers where Dr. Green held privileges regarding the Stipulation. (*Id.*). Many facilities summarily suspended Dr. Green's privileges, not for cause but rather, automatically based on each facility's Bylaws.

**South Denver Anesthesiologists ("SDA") Becomes Part of USAP-CO**

23.     In early January 2016, while Dr. Green was on his medical leave, Defendants joined with another anesthesiology practice group in Colorado, South Denver Anesthesiologists ("SDA"), adding approximately ninety (90) anesthesiologists to the group.

24.     As part of the GCA-SDA integration, Defendants began implementing facility-specific call coverage and new regional pods for scheduling. (Integration PPT, attached as Exhibit 12).

25.     Prior to the SDA transaction, GCA was generally divided into two regions for call coverage and scheduling: north and south. Dr. Green, however, held credentials at facilities across both regions and was routinely scheduled to cover cases and call in

both regions. (Green Deposition, Ex. 5 at pp. 64-65).

26.    During discovery, Defendants admitted that they did not assign Dr. Green to work at specific facilities when he entered into his Physician-Partner Employment Agreement. (Defendants' Admission Responses, attached as Exhibit 13, Request for Admission No. 5).

**Dr. Green's Return to Work & Request for Assistance**

27.    On March 8, 2016, CPHP notified Defendants that Dr. Green's "substance disorder is in early remission" and he is now safe to return to clinical practice. (CPHP Letter, dated March 8, 2016, Exhibit 54).

28.    On March 23, 2016, Dr. Green emailed Marty Watson, Defendants' Senior Vice President for Colorado, regarding his 24-year tenure as a shareholder with MDA and GCA and stating that he "ha[s] had a difficult time trying to navigate my situation… need your help [with reapplying for privileges]." Ms. Watson did not provide assistance to Dr. Green. (Email from Dr. Green to Ms. Watson, dated March 23, 2016, attached as Exhibit 14).

29.    On March 24, 2016, Dr. Green received and signed a letter from Defendants welcoming him back to the practice after his medical leave. The letter referenced his Physician-Partner Employment Agreement and provided, in part: "It is expected that you reapply for privileges at most, if not all the hospitals in which GCA provides anesthesia services. We do not know if you will be successful in securing these privileges however we will fully support your effort to do so." The letter also refers to Dr. Green as a "shareholder."  (Defendants' Ex. C).

30.     Also on March 24, 2016, Ms. Watson sent an email to Dr. Harkness, Dr. Maloney, and Jennifer Klinglesmith summarizing a meeting with HCA's new President and CEO, Sylvia Young.  The email states, in part:

> I thought the meeting with Sylvia went good. We brought Jennifer along with us since she is so actively engaged in working with her teams, medical directors and quality department in getting data. Here's my notes: Peter went through our list of **offenders** first and actions we've taken on them: Ladd, Green, Strausberg…").

(Email from Ms. Watson to Dr. Harkness, Dr. Maloney, and Ms. Klinglesmith, dated March 24, 2016, attached as Exhibit 15) (emphasis added). Drs. Ladd and Strausberg are Physician-Partners with Defendants who lost privileges at HCA facilities due to misconduct. Such Physician-Partners, however, were not disabled and were treated differently than Dr. Green because they were permitted to retain their partnership and maintain their stock, whereas Dr. Green was demoted from partnership and his stock was forfeited. (Harkness Deposition, Ex. 1 at pp.150-157).

31.     At the end of March 2016, Dr. Green returned to practice with Defendants, initially on an observational basis and then on a part-time basis. Defendants scheduled Dr. Green only at those facilities where he held credentials and paid him on an hourly basis, which was inconsistent with the GCA Compensation Plan (Defendants' Ex. A, Section 5 & Exhibit A).

32.     With the assistance of his legal counsel (Ms. Decker), Dr. Green communicated with the hospitals and surgery centers where he previously maintained privileges, and submitted applications for reinstatement and reconsideration. However, Dr. Green's requests for reinstatement were being inexplicably "blocked." (Harkness

Deposition, Ex. 1, pp.158-163).

**Dr. Green is Diagnosed with Autism Spectrum Disorder**

33.     Upon referral by CPHP, on May 10, 2016, Dr. Helena Huckabee, Ph.D., BCBA-D diagnosed Dr. Green with Autism Spectrum Disorder ("ASD" or "Autism"). (Psychological Evaluation, dated May 10, 2016, attached as Exhibit 16).

34.     Dr. Huckabee opined that Dr. Green's ASD negatively impacts his ability to advocate for himself when attending meetings before credentialing committees and that his substance abuse disorder involving alcohol was likely associated with his undiagnosed ASD. (*Id.*)

**Defendants Demote Dr. Green from Partnership**

35.     On July 26, 2016, the Clinical Governance Board ("CGB") of Defendants gave Dr. Harkness the "authority and latitude" to terminate Dr. Green's Physician-Partner Employment Agreement and evaluate options for Dr. Green to continue providing services to Defendants in a "role without call coverage." (CGB Minutes, attached as Exhibit 17). No vote by the CGB was recorded in the Minutes, only a motion. (*Id.*).

36.     By letter dated August 1, 2016, Dr. Harkness notified Dr. Green that his Physician-Partner Employment Agreement would terminate effective August 5, 2018 because he has "not been able to follow the requirements of 2.4(ii) with additional Facilities."[6] (Defendants' Ex. K). The letter also advised that Dr. Green's Common Stock

---

[6] At this time, Dr. Green held privileges at Exempla Saint Joseph Hospital, The Medical Center of Aurora (TMCA-South & Centennial Plaza), Park Avenue Surgery Center, Crown Point, and Highline Surgical Center.

"will be forfeited and will not vest." (*Id.*).

37.     By letter dated August 10, 2016, Paul Dumas, EVP-Human Resources for Defendants, provided: "Dr. Harkness has shared with me your communication that you have an interest in filing for disability…in order to retain USAP shares," and his understanding that Dr. Green applied for long-term disability benefits through Cigna and Lincoln. (Defendants' Ex. K) The letter also stated that Defendants have "no knowledge of a disability which would impact your ability to provide services," but they would "refrain from taking action on your termination as well as on the disposition of your stock for the next fifteen (15) days." (*Id.*).

38.     On August 25, 2016, Carmen Decker, Esq., on behalf of Dr. Green, sent a letter to Mr. Dumas and Dr. Harkness, discussing Dr. Green's disabilities of substance abuse disorder and Autism Spectrum Disorder. (Letter, dated August 25, 2018, attached as Exhibit 18). The letter asserted that Dr. Green was "disabled from work beginning on November 1, 2015" when he began his medical leave of absence, and referenced Section 1.01(a) (Disability) of the VSAA and Section 6.2.4 (disability termination) of the Physician-Partner Employment Agreement to support that Dr. Green's shares should vest pursuant to disability and not be subject to forfeiture. (*Id.*).

39.     Defendants gave Dr. Green a low position on the schedule, but he checked the schedule daily and pick up available shifts from his colleagues.

40.     In early 2017, Defendants begin providing anesthesia for Electroconvulsive therapy ("ECT") procedures at TMCA-North. The procedures are somewhat controversial and are performed in an outpatient facility. The ECT procedures

are short cases and not a coveted assignment by Defendants' anesthesiologists (Emails between Dr. Allen, Dr. Dobrow, Diana Aggers, and Dr. Smith, dated August 13, 2017, attached as Exhibit 54). Dr. Green obtained privileges at TMCA-North and is scheduled to cover the ECT procedures.

**Defendants' Deny Dr. Green's Interactive Process Request**

41.    On March 15, 2017, the undersigned counsel, on behalf of Dr. Green, sent a letter to Defendants requesting to meet with the CGB to discuss his disabilities of substance abuse disorder and Autism Spectrum Disorder, and possible reasonable accommodations. (Letter, dated March 15, 2017, attached as Exhibit 19).

42.    By letter dated April 27, 2017, Defendants denied Dr. Green's request to appear before the CGB and to discuss reasonable accommodations, stating: "GCA has accommodated you, in connection with your ongoing employment, by permitting you to work a reduced hours schedule at the facilities where you have privileges to practice medicine," but because "you are unable to perform the essential Physician-Partner function of taking call, you cannot hold the position of Physician-Partner (Letter, dated April 27, 2017, attached as Exhibit 20).

**First Charge of Discrimination**

43.    On May 30, 2017, Dr. Green dual filed his first Charge of Discrimination with the Colorado Civil Rights Division and the Equal Employment Opportunity Commission, alleging claims for disability discrimination under the ADA and CADA against Defendants. (First Charge of Discrimination, attached as Exhibit 21).

44.    In July 2017, Dr. Allen sent recommendation letters to Porter and Parker

Hospitals, supporting Dr. Green's application for re-credentialing. Later in 2017, Dr. Green is re-credentialed at Parker and Porter Hospitals.

45.    On October 26, 2017, Dr. Green, his undersigned counsel, and Defendants (Mr. Dumas & Jenny Cooper, Esq., Ropes & Gray) participate in an EEOC mediation. During the mediation, Mr. Dumas threatened that Defendants will sue Dr. Green for reimbursement of all cash he received from the GCA-USAP merger in 2015 if he does not dismiss his claims.

46.    On November 15, 2017, CPHP sent a Status Report to Ms. Watson with Defendants providing information on Dr. Green's compliance with treatment and monitoring and his Autism Spectrum Disorder diagnosis. (CPHP Letter, attached as Exhibit 22).

47.    Notwithstanding his "reduced hours schedule" and low position on the schedule, Dr. Green exceeded the work-day equivalent standard for full-time Physician-Partners of 220 days. (Email from Jordan Dodds to Dr. Green, dated March 1, 2018, attached as Exhibit 23) (309 days; top 20%); (Id., Email from

48.    From January to April 2018, Defendants asked Dr. Green to sign a Partner Track Agreement. (Emails, attached as Exhibit 24). Defendants wanted Dr. Green to sign a Partner Track Agreement to avoid paying overtime expenses for after-hours/call shifts that Dr. Green was picking up. (*Id.,* Email from Kent Rodgers to Teresa Foster, dated March 8, 2018, at p. 31; Email from Jennifer Briscoe to Linda Ballard, dated August 23, 2017, at p. 1) ("Dr. Strouse does not want to pay $162/hour for call as he believes that Dr. Green would then be making more than partners.").

49.     Defendants refused to make any revisions to the Partner Track Agreement, including corrections for inapplicable provisions such as a relocation bonus. Defendants also would not agree to expressly carve out Dr. Green's legal claims. (*Id.* at GREEN 1867).

50.     On March 16, 2018, Kent Rodgers called Dr. Green and told him he is no longer allowed to pick up any after hours work unless he signs the Partner Track Agreement. Defendants removed Dr. Green from a trauma shift he had accepted for March 17, 2018. (Defendants' Ex. O at GREEN 1876).

51.     On April 12, 2018, Dr. Green sent Defendants an executed version of the Partner Track Agreement with comments and revisions to provisions 2.4, 6.2.2 and 12.12, to evidence his willingness to be paid under the partner compensation plan, but also to preserve his legal rights with respect to his pending Charge of Discrimination alleging disability discrimination. (Email & signed Agreement, attached as Exhibit 25). Defendants did not return a duly executed Agreement or respond to Dr. Green's email. Defendants still would not allow Dr. Green to pick up call shifts.

52.     Around this same time in April 2018, a psychiatrist at TMCA, Dr. Ahmed Maher, contacted the TMCA site chief for Defendants, Gina Hauessner, M.D. (a recent new hire), to request that Dr. Green be a "no go" for ECT procedures because a nurse at TMCA-North allegedly felt uncomfortable around Dr. Green. (Emails, attached as Exhibit 26). Dr. Hauessner discussed the request with Mr. Dumas and Ms. Handy because she had never handled a similar issue before, and sent an email to the Scheduling Department. (*Id.*); (Deposition of Gina Hauessner, M.D., attached as Exhibit

56, pp.134-137).

53.     Defendants initially removed Dr. Green from the ECT schedule, but then added him back to cover ECTs on April 23, 2018, which prompted Dr. Maher to call Dr. Hauessner again. (*Id.*). Dr. Hauessner spoke with Ms. Handy and Dr. Ceraso about next steps.

54.     By recommendation from Dr. Ceraso, Dr. Hauessner told Dr. Maher that he needed to make a written request in order for Dr. Green to be a "no go" for his procedures. (*Id.*).

55.     At some point, TMCA received a complaint regarding Dr. Green and TMCA's Medical Executive Committee ("MEC") commenced an investigation. The identification of the complainant and the specifics of the complaint, notwithstanding TMCA's production of their investigative file documents in discovery, remains unknown. Dr. Hauessner, who sat on TMCA's MEC, testified that she could not recall during her deposition if she recused herself from the investigation or otherwise why she knew nothing about TMCA's investigation. (Ex. 56: p.129-130).

56.     On April 24, 2018, Defendants' Professional Review Committee ("PRC") was informed of a referral regarding Dr. Green due to a request that he be a "no go" at TMCA-North. (PRC Minutes, attached as Exhibit 27). Per the Minutes, Dr. Green was accused of "inappropriate touching," but the PRC deferred the referral until an investigation was completed by Ms. Handy and Dr. Ceraso (new PRC Chair) (*Id.*)

57.     On April 27, 2018, Ms. Handy emailed Dr. Green to set up a meeting.

58.     On May 3, 2018, Dr. Green met with Dr. Ceraso and Ms. Handy. Dr.

Ceraso and Ms. Handy told Dr. Green that a complaint was made against him by TMCA for sexual harassment, but they did not share any additional details. This was the first notice to Dr. Green of the complaint and he denied the inappropriate touching of anyone. Dr. Green also disclosed to Dr. Ceraso and Ms. Handy that he was diagnosed with Autism Spectrum Disorder, which Dr. Ceraso thought was a joke. (Green Deposition, Ex. 5 at pp. 150-151); (Deposition of Mark Ceraso, M.D. ("Ceraso Deposition"), attached as Exhibit 28, pp. 53-55). Although Ms. Handy was present throughout the meeting, she denies that Dr. Green ever disclosed his Autism Spectrum Disorder. (Handy Deposition, Ex. 50 at pp.110-111).[7]

59.     The following day, after thinking about the issue overnight, Dr. Green called Ms. Handy to share that the only thing he could think of was that he might have put his hands on a nurse's shoulders to comfort her because she seemed stressed/ upset. (Green Deposition, Ex. 5 at 151-153).

60.     In June and July 2018, Dr. Green met with TMCA regarding the investigation and to execute a voluntary remediation agreement. TMCA concluded its investigation by August 1, 2018 and advised Defendants that Dr. Green could return to TMCA-South without restrictions, but TMCA and Dr. Green agreed that he would not go to TMCA-North to avoid a future "conflict" with the unidentified complainant (Email, Ex.

---

[7] During depositions, Ms. Handy and Dr. Ceraso testified very differently regarding what occurred during the May 3, 2018 meeting. For example, Ms. Handy denied that Dr. Green disclosed his Autism Spectrum Disorder during the meeting, whereas Dr. Ceraso testified that he remembered Dr. Green discussing his Autism and that he thought it was a joke. In addition, Dr. Ceraso testified that Dr. Green admitted during the May 3 meeting to "rubbing" a nurse's "neck, shoulders and back" inappropriately, whereas Ms. Handy testified that Dr. Green denied touching anyone during the May 3 meeting, and that she was "surprised" when Dr. Green called her the next day and admitted that he gave a nurse a "shoulder rub." (*Compare* Ceraso Deposition, Ex. 28 at pp.50-61 *with* Handy Deposition, Ex. 50 at pp.110-113).

26 at p. 18; *see also* Green Deposition, Ex. 5 at pp. 165-166).

61.     Defendants did not undertake any other efforts to investigate or conclude the referral regarding Dr. Green before the PRC, in violation of Defendants' written PRC Policy (PRC Policy, attached as Exhibit 29). As such, Dr. Green was not afforded any appeal rights under the PRC policy. (*Id.*)

62.     Dr. Green advised CPHP about the TMCA complaint.

63.     On August 10, 2018, CPHP sent a Status Report to the Colorado Medical Board regarding the TMCA complaint and its opinion that Dr. Green's Autism Spectrum Disorder is the likely cause of the interpersonal issue. (CPHP Status Report, attached as Exhibit 30).

64.     On August 15, 2018, the Colorado Medical Board sent a letter to Dr. Green regarding its investigation regarding the TMCA complaint, to which Dr. Green responded through counsel on September 14, 2018. (Board Letters, attached as Exhibit 31). The Board thereafter dismissed the complaint as unfounded.

**Dr. Green Files This Lawsuit & Defendants Retaliate**

65.     On August 27, 2018, Dr. Green filed the instant lawsuit against the Defendants. [# 1].

66.     Defendants learned of Dr. Green's lawsuit filing on August 28, 2018, and a flurry of emails were exchanged between Defendants' outside counsel, in house counsel (Amy Sanford, Esq.), and many representatives of Defendants, including Dr. Harkness, Dr. Strouse, Dr. Maloney, Ms. Watson, and Ms. Handy. (Privilege Logs & Emails, attached as Exhibit 32).

67.     On August 30, 2018, Dr. Green called Ms. Handy to tell her about his receipt of the letter from the Colorado Medical Board and asked her if she knew who contacted the Board about the TMCA-North complaint.

68.     On August 31, 2018, Dr. Green sent an email to Ms. Handy asking who he should contact at Defendants about the Board letter. (Email, dated August 30, 2018, attached as Exhibit 33).

69.     On September 11, 2018 (15 days after filing his lawsuit), the CGB voted to terminate Dr. Green's employment.  (Defendants' Ex. M).

70.     On September 12-13, 2018, Defendants drafted the termination letter, removed Dr. Green from the schedule, locked him out of the computer system, and arranged for delivery of the termination letter to Dr. Green's home via Federal Express. (*Id.*).

71.     On September 14, 2018, Dr. Green opened his front door in the morning to pick up his newspaper and found a FedEx envelope on the ground with the termination letter from Defendants.

**Second Charge of Discrimination**

72.     On January 28, 2019, Dr. Green filed his second Charge of Discrimination, asserting retaliation claims against Defendants related to the TMCA-North complaint and his termination from employment with Defendants. (Second Charge of Discrimination, attached as Exhibit 34).

73.     On August 21, 2019, Dr. Green amended his Complaint to add claims for retaliation. (# 30).

**<u>CLAIMS AND DEFENSES UPON WHICH JUDGMENT IS SOUGHT</u>**

**A.     Claim 1: Defendants Are Not Entitled to Summary Judgment on Plaintiff's Claims for Disability Discrimination Under the ADA, CADA and the Rehabilitation Act.**

1.     <u>Burden of proof and elements</u>

Dr. Green agrees with the Defendants' recitation regarding the burden of proof as to his disability discrimination claims. Dr. Green also agrees with Defendants that his claims under the Americans with Disabilities Act ("ADA"), the Colorado Anti-Discrimination Act ("CADA") and the Rehabilitation Act should be interpreted consistently for purposes of this Motion, and that the first and second elements of his disability discrimination claims are that he suffers from an ADA-protected disability and that he is qualified.

However, Dr. Green disagrees with Defendants' recitation of third element for his disparate treatment claim. Specifically, Dr. Green disagrees that he must prove "he was discriminated against *solely* because of his disability." (Defendants' Motion, p. 16, citing *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1037-38 (10th Cir. 2011)) (emphasis added). Under existing Tenth Circuit precedent, Dr. Green's disability or disabilities need only be a motivating factor, and not the sole factor, in the Defendants' decision to take an adverse action against him. *See Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1189 (10th Cir. 2003); *see also Edmonds-Radford v. Southwest Airlines Co.*, No. 20-1123, 2021 BL 428355 (10th Cir. Nov. 8, 2021) (("'Liability in a disparate-treatment case depends on whether the protected trait … actually motivated the employer's decision.'") (quoting *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003)).

Accordingly, in order to prevail on his disparate treatment claim, Dr. Green must prove that: (1) he had a "disability" as defined by statute; (2) he was otherwise "qualified" as defined by statute; and (3) his disability was a motivating factor in the Defendants' decisions to demote him from partnership and ultimately, terminate him. 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g); *Poindexter v. Atchison, Topeka & Santa Fe Railway Co.*, 168 F.3d 1228, 1230 (10th Cir. 1999); *Bolton v. Scrivener, Inc.*, 36 F.3d 939, 942 (10th Cir. 1994); *Selenke v. Medical Imaging of Colo.*, 248 F.3d 1249, 1256 (10th Cir. 2001).

2.   <u>Elements Challenged by the Defendants</u>[8]

**<u>Element Two</u>:** Dr. Green can demonstrate a triable issue of fact as to whether he was qualified, with or without reasonable accommodation, to perform the essential functions of his job of Physician-Partner.

**<u>Argument</u>:** When Defendants demoted Dr. Green from partnership in August 2016 and later terminated him in September 2018, Dr. Green met the applicable qualification standards to perform as a Physician-Partner anesthesiologist with Defendants, with or without reasonable accommodation, including the ability to perform call functions at facilities where he maintained privileges. Indeed, Dr. Green maintained consistent licensure and board certification. He also worked 50 hours a week and exceeded the minimum 220 workday equivalents for a Physician-Partner by working

---

[8] Defendants' Motion concedes that Dr. Green suffers from the disabilities of alcoholism and Autism Spectrum Disorder as protected by the ADA, CADA and Rehabilitation Act. *See* Defendants' Motion, p.17, n.3; *see also* Defendants' Statement of Undisputed Material Facts, p.4, paragraph 7. Thus, the first element of Dr. Green's disability discrimination claims is admitted by Defendants for purposes of this Motion for Summary Judgment.

309 WDEs in 2017 (Ex. 23).

In addition, Dr. Green was able to, and did in fact, pick up call shifts from other physicians until Defendants disallowed him to do so. (Email from Kent Rogers to Marc Dobrow and others, dated November 18, 2017, attached as Exhibit 36, p. 3 ("Richard Green … is eligible for overtime for hours worked. Beyond this, we are free to schedule him for call shifts where he is credentialed. It gets expensive when overtime but is a viable option"); *see also* Ex. 36 at p.6, Email from Kent Rodgers to Robyn Eurich, dated August 23, 2018 ("No Call"); *id.* at p.9 ("Green may not be any higher than 1700-1700 and 1500's are okay, he may not ever move any higher in the rotation or take call").

To be entitled to protection under the ADA/CADA/Rehabilitation Act, an employee must establish that he is a "qualified individual." 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability…"). The term "qualified" means that, at the time of the employment decision affecting him, the employee satisfied the required skill, experience, education or other job-related requirements for the position held and could perform the "essential functions" of the position held, with or without reasonable accommodations. 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m); *Kellogg v. Energy Safety Services, Inc.*, 544 F.3d 1121, 1127 (10th Cir. 2008), *quoting Tate v. Farmland Industries, Inc.*, 268 F.3d 989, 992-93 (10th Cir. 2001); *Mason v. Avaya Communications, Inc.*, 357 F.3d 1114, 1118 (10th Cir. 2004), *quoting Davidson v. America Online, Inc.*, 337 F.3d 1179, 1188 (10th Cir. 2003); *Hudson v. MCI Telecom. Corp.*, 87 F.3d 1167, 1168 (10th Cir. 1996).

The ADA does not define the term "essential functions." Regulations interpreting

the Act provide that "essential functions" means "the fundamental job duties of the employment position the individual with a disability holds or desires," as distinguished from "marginal functions." 29 C.F.R. § 1630.2(n)(1). Determining whether a particular function is "essential" is generally a factual inquiry, reserved for the finder of fact. *Bartee v. Michelin North America, Inc.*, 374 F.3d 906, 915 (10th Cir. 2004). Considerations include: the employer's judgment as to whether the function was essential; any written description that was in existence before the dispute arose; the purpose of the position; the number of other employees who were available to perform the particular function(s); the degree of expertise or skill required to perform the particular function(s); the amount of time spent performing the particular function(s); the consequences to the employer of not requiring the employee to perform the function(s); and/or any other factor supported by the evidence. 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n); *Hennagir v. Utah Dep't of Corrections*, 587 F.3d 1255, 1262 (10th Cir. 2009); *Mason v. Avaya Communications, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004); *Davidson v. America Online, Inc.*, 337 F.3d 1179, 1190-91 (10th Cir. 2003); *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 993 (10th Cir. 2001); *Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1174 (10th Cir. 1996), *quoting White v. York Int'l Corp.*, 45 F.3d 357, 361-62 (10th Cir. 1995).

There is no dispute that Dr. Green was qualified to be a Physician-Partner before his alcoholism became active in 2015, which caused his medical license to be temporarily suspended, then retroactively reinstated, and he suffered a loss of privileges at facilities as a result. Defendants seek summary judgment, asserting that Dr. Green could no longer meet the job requirement of taking call because his loss of privileges at

"key medical facilities" precluded Defendants from assigning him to "on-call rotation at a core group of hospitals." *See* Defendants' Motion, p. 19 at 4. However, Defendants' Motion fails to identify the provisions of Dr. Green's Physician-Partner Employment Agreement where the terms "key medical facilities" and "core group of hospitals" are defined. In fact, the terms "key medical facilities" and "core group of hospitals" do not appear anywhere in Dr. Green's Physician-Partner Employment Agreement.

Instead, Dr. Green's Physician-Partner Employment Agreement provides that Dr. Green "successfully apply for and maintain in good standing provisional or active medical staff privileges at the *Facility or Facilities to which the Physician is assigned by GCA.*" *See* # 114-1, Defendants' Exhibit 15, Physician-Partner Employment Agreement, § 2.4(ii) (emphasis added). Although capitalized, the terms "Facility or Facilities" are not defined in Dr. Green's Employment Agreement. The Defendants admitted in discovery that Dr. Green was not assigned to a "Facility or Facilities" when he signed the Agreement. *See* Ex. 13.

In addition, Section 2.1 of Dr. Green's Employment Agreement expressly negates Defendants' position that on-call rotation is an essential function for all Physician-Partners. *See* # 114-1, Physician-Partner Employment Agreement, § 2.1(ii) ("Participation in on-call rotation for after hours coverage, *if applicable*") (emphasis added). Paragraph 26 of Defendants' Statement of Undisputed Facts omits the qualifying language "if applicable."

Further, as of August 2016, when Dr. Green was demoted, the GCA-SDA integration had already significantly changed the facilities serviced by Defendants, the

regions and regional assignments for Physician-Partners, and the call needs for the combined practice. *See* Ex. 12 (including facility-specific call). In 2017, Defendants developed a Senior No Call policy, which allowed certain tenured physicians to opt out of first call. *See* Defendants Combined Responses to Plaintiff's First and Second Sets of Interrogatories, Supplemental Response to Interrogatory No. 7, attached as Exhibit 37. And, there have been various Physician-Partners over time who do not take any call or have reduced call. (Email, dated July 26, 2018, attached as Exhibit 44 (Dr. Bernardini, Dr. Villaflor, and Dr. Scott either do not take call or take reduced call); Email, dated May 31, 2018, attached as Exhibit 45 (discussing the general classifications of full-time partner, legacy shareholder and hourly physician and corresponding call requirements)).

Finally, Defendants admit in discovery that not all Physician-Partners were assigned to take call. (Ex. 13, Defendants' Response to Request for Admission No. 8); 2019 Call Team List spreadsheet, attached as Exhibit 55 (showing 15 Physician-Partners who are not assigned to any regional call team, as well as other Physician-Partners who are assigned to only one facility-specific call team)).

Defendants contend that Dr. Green conceded in his deposition that, to maintain his partnership, he was required to be credentialed at the facilities "where he regularly worked [before November 2015], which includes covering call at Saint Joseph's Hospital, Rose Medical Center, Presbyterian/Saint Luke's Hospital, The Medical Center of Aurora, Porter Hospital, and Parker Hospital." *See* Defendants' Motion at p. 19. Defendants' attempt to bootstrap a list of contractually "assigned" facilities with a snippet of Dr. Green's deposition testimony should be rejected, as it runs contrary to

Defendants' position in discovery and is a disputed issue of material fact. (*Compare* Ex. 13, Defendants' Response to Request for Admission No. 5 (Defendants admit that Dr. Green was not assigned to a "facility or facilities" in April 2015, when he signed the Physician-Partner Employment Agreement) *with* Deposition of Matthew Maloney, M.D. ("Maloney Deposition"), attached as Exhibit 42, pp.120-122 (his belief that Dr. Green was assigned to the North region); *see also* email dated February 24, 2017, from Dr. Allen to Dr. Mejia, attached as Exhibit 43 ("How can Porter be a Core hospital if several GCA legacy doctors who take N call do not have privileges there? When did Swedish and Littleton become Core Hospitals? Do all GCA legacy physicians have privileges at Swedish and Littleton? Who covers Swedish and Littleton on call - North or South?")). Defendants' bootstrapped list of "assigned" facilities to Dr. Green includes facilities in different regions, which does not comport with any regional assignments either before or after the GCA-SDA integration.

Defendants' March 15, 2016 letter to Dr. Green states, among other things: "[i]t is expected that you reapply for privileges *at most, if not all the hospitals* in which GCA provides anesthesia services." (# 114-3, Defendants' Exhibit D, p. 2) (emphasis added). Defendants' letter, however, does not identify any names of hospitals or surgery centers where Dr. Green was required to obtain privileges to maintain his partnership. The plain language, "reapply for privileges at most, if not all the hospitals," hardly equates to an undisputed fact that Dr. Green was contractually bound to maintain credentials at all of the hospitals and surgery centers he previously and regularly worked prior to November 2015.

Because there is a genuine dispute of fact as to what represents the "the Facility or Facilities to which the physician is assigned," as set forth in Dr. Green's Physician-Partner Employment Agreement, and whether participating in on-call rotation at such "Facility or Facilities" is an "essential function" for a Physician-Partner, a trial is required on Dr. Green's disparate treatment claims.

**Element Three**:  Dr. Green can demonstrate a triable issue of fact as to whether disability was a motivating factor in the Defendants' decisions to demote him from partnership and ultimately, terminate his employment.

**Argument**:  Dr. Green's disabilities of substance abuse disorder and Autism Spectrum Disorder were a motivating factor in Defendants' decisions to demote him from partnership and terminate his employment because: (a) Defendants have a *per se* discriminatory no-accommodation policy for physicians with disabilities; (b) Defendants' decision-makers imply that Dr. Green's disabilities were a factor in their employment decisions; (c) Defendants impeded Dr. Green's ability to regain his privileges with at least one hospital system (HCA); and (d) Defendants' imposition of a rigid "full time, full call" job standard for partnership on Dr. Green was inconsistent with how Defendants treated other Physician-Partners and has a disparate impact on persons with disabilities.

Dr. Green is not required to prove that his disability or disabilities were the sole or exclusive motivating factor for the Defendants' decision(s) to take adverse action or that all of the Defendants' stated reasons for the adverse employment action were false. Dr. Green must prove only that his disability or disabilities were a motivating factor. That is,

Dr. Green's disability or disabilities were a factor that made a difference in the Defendants' decision to demote and/or terminate him.

In determining whether disability was a "motivating factor" in the Defendants' decision to demote Dr. Green and/or terminate his employment, any statements made or act done or admitted by the Defendants, and all other facts and circumstances indicating state of mind, may be considered. An improper motive is seldom directly admitted and may be inferred from the existence of other facts. 42 U.S.C.A § 2000e-2(m); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94 (2003) (recognizing a Plaintiff may prevail on a discrimination case even when more than one factor motivated the employer's employment decision); *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217 (10th Cir. 2008); *Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir. 1995); *James v. Sears, Roebuck & Co.*, 21 F.3d 989, 992 (10th Cir. 1994); *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004); *James v. Sears, Roebuck & Co.*, 21 F.3d 989, 992 (10th Cir. 1994); *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 256 (1981), citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804-05 (1973).

The strongest evidence that disability was a motivating factor in Defendants' employment decisions is Defendants' *per se* discriminatory no-accommodation policy for physicians with disabilities. *See* Ex. 2, Allen Deposition, pp. 173:19-25; 174-178 ("… HR has directly told me - and Dr. Matt Maloney has directly stated to me, as well as other … physicians - USAP is a no-accommodation entity, we do not accommodate for disability. We will not accommodate any physical disability, and we do not accommodate for any time-limitation disability."); *see also* email from Dr. Allen to Dr. Maloney and

others, dated December 22, 2018, attached as Exhibit 46. Indeed, Defendants tell physicians who disclose medical or disability issues to the practice and request accommodations that they will need to be moved to a day doctor position, which is financially punitive. Ex. 2 at pp. 182-183.

During depositions, Defendants' decision-makers implied that the nature of Dr. Green's disabilities was a factor in the employment decisions. *See id.* at p.181:12-14 ("…if there is an alcohol abuse disorder, the concern is always the potential that they are impaired at some time"); *see also* Maloney Deposition, Ex. 42 at pp. 171-172 ("we were more focused on protecting the reputation of the practice"); *see also* Email, dated October 16, 2018 from Dr. Allen to Dr. Davis, attached as Exhibit 47 ("Richard Green had[] too many problems to continue, very tragic.").

In addition, an email produced in discovery shows that, in March 2016, Defendants impeded Dr. Green's ability to regain his privileges with HCA, by referring to Dr. Green as an "offender" to HCA's CEO, Sylvia Young. *See* email from Marty Watson to Dr. Harkness, Dr. Maloney, and Jennifer Klinglesmith, dated March 24, 2016, attached as Exhibit 15 ("I thought [the meeting with Sylvia Young, President and CEO of HCA Continental Division] went good. … Peter went through our list of **offenders** first and actions we've taken on them: Ladd, Green, Strausberg…") (emphasis added). Labeling Dr. Green as an "offender" to a hospital CEO, who has the authority and discretion to block credentials for any provider from Defendants at HCA facilities, is not helpful advocacy for a physician, like Dr. Green, who is in need of support and assistance. (HealthONE PSA, Ex. 9 at p. 1).

Next, although Defendants' Motion asserts that "USAP provided full administrative support to Plaintiff, including help from USAP's credentialing staff in submitting requests for privileges," emails show that Defendants were, at best, selectively providing credentialing assistance to Dr. Green. (Email from Leora Brewer, Credentialing Manager, to Marty Watson and Diana Aggers, dated June 7, 2017, attached as Exhibit 35 ("Hey ladies, I just wanted to confirm with you both that we should be assisting Dr. Green in obtaining privileges at Parker and Porter."); (*Id.*, Email from Marty Watson to Peter Harkness, Barbara Allen, Paul Dumas, Leora Brewer, and Diana Aggers, dated June 9, 2017 ("Hey Group - I wanted to check from your vantage point if we are trending positively to assist [Richard] Green in obtaining privileges again at Parker and Porter…")).

In December 2017, Defendants continued to filter support for Dr. Green with his re-credentialing applications. (Ex. 35, Email from Leora Brewer to Diana Aggers, Dr. Harkness, Dr. Dobrow, Dr. Strouse, Dr. Smith, Kent Rodgers, and Ms. Watson, dated December 6, 2017 ("We did receive an application from Centura but I forwarded to Marty and Paul Dumas first since I was not sure how this was requested and if we should move forward considering our current situation…We have not put this in process yet but will proceed as directed."). Defendants' self-serving characterization that they provided "full administrative support" to Dr. Green is not borne out by the discovery.

Lastly, Defendants' conduct of imposing a job standard and qualification criteria for on-call rotation at unspecified facilities or self-selected regions has the effect of discrimination as it impermissibly screens out individuals with disabilities. *See* 42 U.S.C.

§ 12112(b) (the ADA prohibits discrimination in the utilization of job standards and criteria that have the effect of discrimination and the use of qualification standards or employee tests that screen out individuals with disabilities). Defendants did not universally apply the same job standard and qualification criteria of on-call rotation and required hospital privileges to all Physician-Partners that they claim was required of Dr. Green, and they treated Dr. Green more harshly than other Physician-Partners with credentialing issues or a facility complaint — conduct which supports Dr. Green's discrimination claims. *See* email from Dan Wonstolen, Scheduling Manager, dated August 3, 2017, attached as Exhibit 38 ("I can say that there are other physicians-partners within USAP-CO (on both sides) who do not take call.").

In terms of comparators, David Ladd, M.D., Physician-Partner, lost his privileges with a HCA hospital (PSL) for walking into an MRI suite with a backpack of weights that caused $500,000 in equipment damage, yet Defendants permitted Dr. Ladd to maintain his partnership and stock and took no action against him. Since Dr. Ladd lost privileges at PSL, he could not have participated in the on-call rotation for Defendants' region that includes PSL. (Harkness Deposition, Ex. 1 at p.155:18-25; 156:1-18); (Emails between Dr. Harkness, Dr. Allen and Rusty Oesch, dated April 27, 2016, attached as Exhibit 39 ("Bigger concern is ADA as substance abuse disorder is considered medical … Dr. Villaflor and Dr. Ladd are still paid the same as partners … No availability is paid [for Green]").

Other comparators evidencing Dr. Green's demotion was discriminatory include:

- Javier Fischer, M.D., Physician-Partner, no known disability: Dr. Fischer's privileges were revoked at four (4) HCA hospitals for sleeping during surgery, yet Defendants permitted him to maintain his partnership and stock. Defendants also undertook significant efforts to advocate for Dr. Fischer with hospital CEOs, something they did not do for Dr. Green (Emails between Dr. Harkness, Dr. Betts, Dr. Allen, Ms. Handy, Ms. Watson, and others, dated July 13, 2018 & September 20, 2018, and spreadsheet of facilities for Dr. Fischer, attached as Exhibit 40).

- Steve Kallsen, M.D., Physician-Partner, no known disability: Dr. Kallsen lost his privileges at two (2) HCA hospitals (PSL and Rose), but Defendants allowed him to maintain his partnership and stock. (Emails, dated October 7, 2015, attached as Exhibit 41).

- Thomas McGeary, M.D., Physician-Partner, no known disability: Dr. McGearly took a leave of absence for over two (2) years (with no participation in on-call rotation), yet Defendants allowed Dr. McGeary to maintain his partnership and stock, and participate in a 2017 liquidity event where he was able to purchase more stock. (Email, dated July 5-6, 2017, attached as Exhibit 48).

- Joseph Strausberg, M.D., Physician-Partner, no known disability: Dr. Strausberg was accused of assault by a patient and surgeon at a HCA hospital (Sky Ridge Medical Center) and lost privileges at Sky Ridge, yet

Defendants allowed Dr. Strausberg to maintain his partnership and stock. (Harkness Deposition, Ex. 1 at pp. 150-154).

Still other non-disabled Physician-Partners who committed misconduct were treated more favorably than Dr. Green. (Email, dated November 15, 2018, attached as Exhibit 49 (Mark Ryan, M.D., permitted to resign his employment with Defendants after admitting that he assaulted a nurse at a hospital facility)); Deposition of Tillie Handy ("Handy Deposition," attached as Exhibit 50, pp. 165-169 (Philip Johnson, M.D., permitted to retire after a complaint by nursing staff at hospital for watching pornography during surgery); Email, dated April 16, 2018, attached as Exhibit 51 (Richard Wilson, M.D., not disciplined after complaint at hospital facility regarding sexist comments to nursing staff)).

An employer fires an employee *because of his disability* when the decision is based on conduct caused by the disability at issue. *Teahan v. Metro-North Commuter R.R. Co.*, 951 F.2d 511, 515-16 (2d Cir. 1991) (Rehabilitation Act of 1973); *see also Pernice v. City of Chicago*, 237 F.3d 783 (7th Cir. 2001) (ADA can protect a plaintiff from adverse employment action taken because of his alcoholism or drug addiction). In other words, an employer "relies" on a handicap or disability when it justifies termination based on conduct caused by the handicap or disability. *Teahan*, 951 F.2d at 516. An employer does not "rely" on a handicap only when it can point to behavior that is not causally related to that handicap. *Id.* In this case, the causal connection between Dr. Green's alcoholism (handicap) and his loss of credentials (symptomatic manifestation of the handicap) is such that Defendants did "rely" on Dr. Green's handicap.

The rationale of *Teahan*, in simple terms, is that a plaintiff whose limp causes him to make a thump when he walks is fired *because of his limp* even if the employer fired him for making the thumping noise. *Id.* This rationale is applicable in this case, where Dr. Green did not commit any misconduct, but his disability caused him to suffer a temporary license suspension and resulting loss of privileges, and Defendants fired him because of those loss of privileges.

As discussed above, Defendants have a *per se* discriminatory no-accommodation policy and purport to have a job standard of "full time, full call" based on self-defined regions, which is not always applied. Defendants treated Dr. Green differently than other Physician-Partners who were not disabled and had reduced privileges that affected their ability to participate in "full" on-call rotations. Dr. Green was also treated more harshly than other non-disabled Physician-Partners who received complaints at facilities. Combined with the statements made by Defendants that evidence an implicit bias toward Dr. Green due to the nature of his disability, there is a genuine dispute of fact as to whether disability was a motivating factor in the Defendants' adverse employment decisions affecting Dr. Green, and a trial is required on Dr. Green's disparate treatment claims.

**B.     Claim 2: Dr. Green Proposed Reasonable Accommodations and Defendants Failed to Engage in the Interactive Process.**

1.     Burden of Proof and Elements

Dr. Green agrees with the Defendants' recitation of the burden of proof as to his claim that he proposed reasonable accommodations and that Defendants failed to engage in the interactive process.

2.    <u>Elements Challenged by the Defendants</u>

**Argument**: Notwithstanding that Defendants' representatives in nearly every deposition consistently denied knowing about Dr. Green's disabilities, the Chronological Statement of Facts, *supra*, details the numerous disclosures made to Defendants, by both CPHP and by Dr. Green. When Dr. Green's medical leave was coming to a close, he reached out to Ms. Watson for assistance with his particular situation and credentialsing issues. (Ex. 14). Ms. Watson undertook no efforts to assist Dr. Green with his credentialing.

Dr. Green also kept Dr. Harkness apprised of his re-credentialing efforts and sought Dr. Harkness' guidance and assistance, but Dr. Harkness felt that Dr. Green needed to get "in the door" at facilities first. (Harkness Deposition, Ex. 1 at pp.160-161).

Dr. Green, through his legal counsel, raised the issues of his disabilities, made disclosures regarding his limitations, and requested for Dr. Green to appear before the CGB to discuss his disabilities and possible reasonable accommodations (Exs. 18 & 19). Defendants responded with either silence or refusal of the request. (Ex. 20).

As there is sufficient evidence in the record regarding Dr. Green's attempts to engage in the interactive process with Defendants and/or propose reasonable accommodations, together with Defendants' refusal or silence, Dr. Green's discrimination claims based on these theories should go to a trial.

### C.    Claim 3: Defendants' Adverse Actions were Retaliatory.

#### 1.    Burden of proof and elements

Dr. Green agrees with the Defendants' recitation of the burden of proof as to his retaliation claims and that his claims under the ADA, CADA and the Rehabilitation Act should be interpreted consistently for purposes of this Motion.  Dr. Green also generally agrees with the elements for a retaliation claim cited by Defendants.

However, Dr. Green also asserts that "a plaintiff can establish pretext by showing the defendant's proffered non-discriminatory explanations for its actions are 'so incoherent, weak, inconsistent, or contradictory that a rational fact-finder could conclude [they are] unworthy of belief."  *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010) (quoting *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1197 (10th Cir. 2008)).

#### 2.    Elements Challenged by the Defendants

**Elements Two & Three:**   Dr. Green can demonstrate a triable issue of fact that Defendants took adverse action against him subsequent to or contemporaneous with the protected activity, and that a causal connection exists.

**Argument:** Dr. Green duly filed two Charges of Discrimination with the CCRD and EEOC — the first on May 30, 2017 and the second on January 28, 2019. (Exs. 21 and 34). On August 27, 2018, Dr. Green filed this lawsuit (# 1). It is undisputed that filing charges of discrimination and a legal action are protected activity.  It is also undisputed that Defendants voted to terminate Dr. Green on a conference call on September 11, 2018.

The strongest evidence that Dr. Green suffered retaliation for engaging in protected activity is that he was terminated just fifteen (15) days after he filed his lawsuit. Where a termination occurs two weeks after a protected activity, such close temporal proximity is "alone sufficient to establish a causal connection." *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008); *see also Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (holding that close temporal proximity of twenty-four days between plaintiff's complaint and his termination was sufficient to establish a causal connection). Here, Dr. Green has produced enough evidence to establish a *prima facie* case of retaliation, and summary judgment should be denied.

Retaliation also includes any action that would dissuade a reasonable employee from engaging in protected actions. Here, Defendants pressured Dr. Green to sign a new Partner Track Agreement for four months, from January through April 2018, and took away his ability to pick up call shifts or move up on the schedule since he requested to include revisions to the proposed agreement in order to protect his legal claims, but Defendants did not wish to afford him those reasonable rights. Thereafter, Defendants handled a facility complaint in a manner that exacerbated the circumstances adversely toward Dr. Green, and failed to conduct a PRC investigation and process of the matter consistent with the PRC policy, including failing to afford Dr. Green any appeal rights under the policy (Ex. 29).

Defendants claim that the decision to terminate Dr. Green's Physician-Partner Employment Agreement on August 1, 2016 was based on the legitimate, non-

discriminatory reason of Dr. Green's inability to perform the contractual requirements for a partner position, by the lack of required credentials and inability to participate in a regional on-call rotation. (Defendants' Motion, p. 27). However, as discussed above in Section A, Defendants permitted other, non-disabled Physician-Partners to maintain their partnership and stock, notwithstanding that they lost privileges at one or more hospitals in a region and necessarily could not participate in "full call." Likewise, Defendants permitted a Physician-Partner, Dr. McGeary, to be on a leave of absence lasting over two years, during which time he necessarily could not participate in "full time, full call" duties, yet he still maintained his partnership and stock. (Ex. 48).

Defendants also claim that the decision to terminate Dr. Green's employment on September 11, 2018 was based on the legitimate, non-discriminatory reason of a violation of USAP's Code of Conduct and Dr. Green's failure to "promptly notify" Defendants regarding a letter he received from the Colorado Medical Board. (Defendants' Motion at p. 28). However, the conflicting testimony from the only two people who "investigated" the alleged complaint on behalf of Defendants (Ms. Handy and Dr. Ceraso) and the curious circumstances giving rise to the complaint at TMCA-North (removing Dr. Green from the schedule after a surgeon's request, adding Dr. Green back to the schedule, and advising the surgeon that a formal request was required to make Dr. Green a "no go" on his preference list), give rise to a rational fact finder's conclusion that Defendants' reasons are not worthy of belief.

Additionally, if Defendants are to be believed, then Defendants knew about the alleged conduct violation at TMCA-North in April 2018, and knew about Dr. Green's

alleged admission of sexual harassment on May 4, 2018, but waited over four (4) months to terminate Dr. Green based on such conduct. Likewise, Defendants knew that Dr. Green would not return to TMCA-North as of August 1, 2018, but waited 1-1/2 months to exercise a termination. Given that Defendants actually ended up voting in support of termination on September 11, 2018 and delivering Dr. Green the termination letter on September 14, 2018 (3 days later), no rational fact-finder could find it was reasonable for Defendants to delay up to four (4) months before terminating Dr. Green's employment based on such legitimate reason.

Moreover, it is incoherent that Dr. Green allegedly refused to "promptly disclose" to Defendants a letter he received from the Colorado Medical Board, when he was the one who volunteered the information about his receipt of the letter in the first instance to Ms. Handy on a call he initiated on August 30, 2018. Dr. Green also sent a follow-up email to Ms. Handy on August 31, 2018 inquiring about who he should contact with Defendants about the letter, which further belies Defendants' reasons given for the termination decision. (Ex. 33).

In both of the situations relied on by Defendants to support Dr. Green's termination from employment, Ms. Handy is the sole witness to Dr. Green's alleged admission of sexual harassment on May 4, 2018 and alleged refusal to provide a copy of a letter to Defendants on August 30, 2018. Common sense defies that the termination of employment of a 25-year tenured physician based solely on the uncorroborated statements of a human resources employee.

Discriminatory intent, on the other hand, can be reasonably inferred given the short temporal proximity between Dr. Green's lawsuit filing on August 27, 2018, the flurry of emails discussing the lawsuit filing in the days following, and Defendants' vote to terminate on September 11, 2018. (Ex. 32). Because the evidence, viewed in the light most favorable to Dr. Green, shows that Defendants' proffered explanations are implausible, weak and/or incoherent, Dr. Green has met his burden on summary judgment that the reasons offered by Defendants are merely pretext, and summary judgment should be denied.

### D.    <u>Plaintiff's Breach of Contract Claims Should Go to Trial.</u>

#### 1.    <u>Burden of Proof and Elements</u>

Dr. Green agrees with the Defendants' recitation of the burden of proof and elements on his breach of contract claims.

#### 2.    <u>Elements Challenged by the Defendants</u>

**Elements Two & Three**: Dr. Green can demonstrate a triable issue of fact as to whether he performed under the contract, and Defendants failed to perform.

**Argument**: Defendants do not dispute that the Physician-Partner Employment Agreement is a valid and binding contract or that Dr. Green has suffered damages. Defendants' Motion, however, argues that Dr. Green cannot prove that he "performed the duties under the contract" because he allegedly failed to maintain his privileges at "core USAP facilities," a term/phrase not included or defined in the Agreement. (Motion at p. 37). Defendants also argue that they should be excused from their obligations under the Agreement because Dr. Green "has admitted that he breached the Physician-

Partner Agreement's explicit requirement of maintaining privileges at USAP facilities." (*Id.* at 2).

"The 'performance' element in a breach of contract action means 'substantial performance,' which 'occurs when, although the conditions of the contract have been deviated from in trifling particulars not materially detracting from the benefit the other party would derive from a literal performance, [the defendant] has received substantially the benefit he expected, and is, therefore, bound to pay.'" *Eucker v. Sunland Asphalt & Constr., Inc.*, No. 18-cv-02408-MSK-NRN, 2020 BL 76526, *6 (D. Colo. Mar. 2, 2020) (quotations omitted).

When a claim is for breach of an employment contract, if Dr. Green can show that he "substantially performed his duties under the Employment Agreement or that there existed some justifiable reason for him not to do so," his showing is sufficient for elements three and four of a breach of contract claim. *Eucker*, 2020 BL 76526, at *7. In other words, if Dr. Green performed his duties, there would be no "cause" to terminate his employment. *Id.*

It is undisputed that Dr. Green came back to work in earnest in March 2016, reapplied for privileges at HCA hospitals, Centura hospitals, Exempla Saint Joseph Hospital, and Rose Hospital, and exceeded the workday equivalent standard for Physician-Partners (Ex. 23), notwithstanding that Defendants gave him a low position on the schedule and did little to aide him with his re-credentialing efforts. Dr. Green regained his privileges at Exempla Saint Joseph Hospital and The Medical Center of

Aurora (an HCA hospital), along with three surgical centers in 2016. By 2017, he had obtained additional credentials at Parker and Porter hospitals.

Unfortunately, Dr. Green was being inexplicably blocked in obtaining credentials at other HCA and Centura facilities, which can be justifiably excused by Defendants' overt negative characterization of him to the CEO of HCA Continental Division as an "offender." (Ex. 15). Dr. Green could, and did, perform call functions from 2016 to 2018, and he picked up facility-specific call when it was available, so much so that he was in the top 20% of his peers for workday equivalents.

Defendants, on the other hand, breached the Employment Agreement by not paying Dr. Green consistent with the Compensation Plan for Physician-Partners when he returned from his medical leave at the end of March 2016 and instead paying Dr. Green on an apparent hourly basis with no availability pay. (Ex. 39). Defendants' breach in this regard was not fully known to Dr. Green until discovery in this case.

In August 2016, Defendants further breached the Physician-Partner Agreement by terminating the Agreement without exercising one of the defined termination events set forth in Section 6 of the Agreement, and asserting that an alleged violation of Section 2.4(ii) instead supports a termination of his partnership.

Defendants, however, failed to comply with the procedures for termination of a Physician-Partner as set forth in the CGB Charter expressly incorporated into the Agreement. The CGB Charter provides:

> D. <u>Specific Denver CGB Approval Rights</u>. Neither the Practice nor USAP may take, or cause to be taken, any of the following actions without the prior approval of the Denver CGB by the Approval Vote (unless specified otherwise) of its Denver CGB Members, or the waiver or delegation of such

approval right to the Practice or USAP (which may be rescinded at any time in the sole discretion of the Denver CGB). The Denver CGB shall exercise its approval rights hereunder in accordance with the budgets and business plans of the Practice, and in consideration of its other responsibilities and duties under Sections A, B and C of this Charter:

…

12. Subject to any other approvals required, by a vote of the Denver CGB Members representing at least sixty-seven percent (67%) of the votes of the Denver CGB Members, terminate a Physician-Partner or a Voting Legacy Shareholder of a Denver Division pursuant to each Physician-Partner's or Voting Legacy Shareholder's employment agreement or independent contractor agreement, as applicable;

13. Designate a new Physician-Partner of a Denver Division, or change the designation of an existing Physician-Partner of a Denver Division;

Notwithstanding anything set forth herein, the Denver CGB Members shall have the authority to evaluate whether an existing Physician-Partner of a Denver Division should remain as such designation if he or she has failed to meet the criteria of a Physician-Partner of a Denver Division as set forth in the Compensation Agreement for one (1) full year and has not taken affirmative steps (as shall be determined by the Denver CGB in its sole discretion) to meet the criteria within six (6) months following notice to the Physician-Partner by the Denver CGB; provided, however that the Physician-Partners of SDA may be evaluated within the first sixty (60) days following the effectiveness of this Charter. If the Denver CGB elects to change the designation of a Physician-Partner of a Denver Division to a Voting Legacy Shareholder in accordance with the terms hereof, such physician will automatically be subject to a new employment agreement in the same form as the then current Voting Legacy Shareholder Employment Agreement. As long as a Physician-Partner of a Denver Division is full-time, with full call availability (not giving away call) as that is determined by such Denver Division's scheduling committee, and is not taking more than the standard vacation approved for such Denver Division, then the presumption of the Denver CGB will be that such physician is meeting the minimum requirements of a Physician-Partner of a Denver Division as set forth in the Compensation Agreement, irrespective of the minimum unit or working day equivalent requirements, as applicable.

…

Notwithstanding anything set forth herein, the Denver CGB Members shall have the right to waive, with the prior approval of the Practice and USAP (such approval shall not be unreasonably withheld, conditioned or delayed), any requirements set forth in the employment agreement for the

Physician-Partners or Voting Legacy Shareholders, whether such waiver is determined on a case-by-case basis or adopted as a policy by the Denver CGB and submitted to the Practice and USAP for approval. As of the date of this Charter, the Denver CGB, along with the Practice and USAP, has adopted the policies set forth on Schedule B hereto with respect to the physicians of SDA named therein.

(Ex. 58, Exhibit E - Amended and Restated Clinical Governance Board Charter, Effective as of December 31, 2015, pp. 9-13).

The "Approval Vote" means:

Except as provided herein, (i) any decision made by the Denver CGB in 2016 shall require the approval of the Denver CGB Members representing at least twelve (12) votes, (ii) any decision made by the Denver CGB in 2017 shall require the approval of the Denver CGB Members representing at least ten (10) votes, (iii) except as otherwise provided in this Charter, any decision made by the Denver CGB from and after January 1, 2018 shall require the approval of the Denver CGB Members representing at least a majority of the votes of all the Denver CGB Members and (iv) any decision that requires the approval of the Denver CGB Members representing at least sixty- seven percent (67%) of the votes of the Denver CGB Members in accordance with the terms hereof shall require the approval of the Denver CGB Members representing at least sixty-seven percent (67%) of the votes of the Denver CGB Members then in office (such approval thresholds, the "***Approval Vote***").

(*Id.* at p.5). According to the CGB Minutes from the conference call held on July 26, 2016, Defendants failed to comply with the above provisions of the CGB Charter, by not conducting and recording an "Approval Vote" before terminating a Physician-Partner Employment Agreement or changing the designation of a Physician-Partner. (*Id.*).

Defendants further breached the covenant of good faith and fair dealing by not replacing Dr. Green's Physician-Partner Employment Agreement with a new Voting Legacy Shareholders Agreement, as provided in Section 11.12 of the Employment Agreement:

11.12  Amendment.  This Agreement may only be amended by a writing signed by each of the parties hereto; provided, however, during the initial five (5) year period following the Effective Date, this Agreement may automatically be replaced with a new employment agreement upon notice to the Physician if the Physician no longer qualifies as a Physician-Partner (as defined in the Plan Regarding Compensation for Services) and the Clinical Governance Board has elected to change such Physician's designation in accordance with the terms of the Charter of the Clinicial Governance Board then in effect. The replacement employment agreement shall be substantially similar to the form of employment agreement executed by the Voting Legacy Shareholders (as that term is defined in the Plan Compensation for Services), provided that, Physician shall continue to be compensated on the same terms in accordance with the GCA Compensation Plan.

(Physician-Partner Employment Agreement, Defendants' Ex. A, Section 11.12).

The termination events of Dr. Green's Employment Agreement are clearly defined in Section 6. (Defendants' Ex. A, pp.10-15). Section 6 contains no reference to a termination based on a purported breach of Section 2.4(ii). Indeed, the Employment Agreement has a specific breaches provision in the termination section, which provides:

6.2.2 <u>Termination for Specific Breaches</u>. In the event Physician shall (i) materially fail by omission or commission to comply with the provisions specified in Section 2.1 hereof, or (ii) materially fail to comply with the provisions specified in Section 2.2 hereof, and Physician is unable to cure such material failure within fifteen (15) days after his or her receipt of a written notice from GCA informing him or her of such material failure, this Agreement may then be terminated in the discretion of GCA by written notice to Physician.

(*Id.* at p.11).  The above cited provision for a termination for specific breaches, however, makes no mention of a termination for a breach of Section 2.4. Also, while other provisions of the Employment Agreement include language that non-compliance with such provision is a "material breach," no such language is included in Section 2.4 — the provision relied on by Defendants to support its decision to terminate Dr. Green's

Employment Agreement. (S*ee, e.g., id.* at Section 2.3 (Compliance) and 2.11.1 (Discretionary Reviews)).

In addition, as discussed above in Section 2, the language of Section 2.4(ii) is ambiguous and thus, a disputed issue of material fact. Because Defendants did not properly exercise a termination event as mutually agreed in the Agreement, and because a termination based on Section 2.4(ii) is a question of fact, summary judgment cannot enter in favor of Defendants.

### a. The More Specific Disability Termination Provision Controls

Pursuant to the terms of the Vesting and Stockholders Arrangement Agreement ("VSAA), Section 1.01(a) any shares of common stock issued to Dr. Green become vested upon the "Disability" of the shareholder. (VSAA, Ex. 7). The VSAA provides that "Disability" shall have the same meaning assigned to such term as defined by the referenced Employment Agreement between the shareholder and GCA. (*Id.*, Section 1.01 (e)(iii)). Dr. Green's Physician-Partner Employment Agreement, effective February 10, 2015, defines "disability of Physician" as follows:

> The term 'disability of Physician' shall have the same meaning as that type of disability that entitles Physician to payments for permanent disability pursuant to the disability policy covering Physician; provided, that, in the event (A) no disability policy exists covering Physician or (B) the terms of such Policy do not qualify Physician for payments for permanent disability, the term 'disability of Physician,' as used herein, shall mean that point in time when Physician is unable to resume the normal and complete duties required of Physician in Article 2 of this Agreement and standards applicable to Physician, as performed prior to such time, within one hundred and eighty (180) days after the disabling event. If the disabling event is not a separate and distinct happening, the 180-day period shall begin at the time Physician is unable to perform the duties required in Article 2 of this Agreement for thirty (30) consecutive work days.

Additionally, Physician shall be considered disabled if Physician does not perform his or her duties for one-hundred and eighty (180) days during the 360-day period.

(Physician-Partner Employment Agreement, Defendants' Ex. A; Section 6.2.4). Under the above referenced language, the VSAA, incorporating the definition of "disability of Physician" in the Employment Agreement, requires an analysis of whether Dr. Green has been able resume his normal and complete duties as required by Article 2 of his Employment Agreement within 180 days.

There is no dispute that Dr. Green's period of "disability" under his Employment Agreement began approximately November 1, 2015. As a result of this disability, Dr. Green was unable to regain his privileges and resume the normal and complete duties required of him pursuant to Article 2 of the Employment Agreement (namely, obtaining credentials at all facilities assigned and performing on-call rotation duties) for more than 180 days, November 1, 2015 through August 1, 2016.

Defendants' termination of Dr. Green was predicated on the loss of his facility privileges, which was the direct result of his disability. The suspension order issued by the Colorado Medical Board in November 2015 was the direct result of Dr. Green's disability. In addition, in May 2016, Dr. Green was diagnosed with Autism Spectrum Disorder, which diagnosis has contributed to his loss of privileges, as confirmed by his health care providers.

The Colorado Court of Appeals has considered the very issues presented in this case. Namely, whether an employer can terminate a physician 'for cause' in light of the physician's loss of licensure as a result of a disability in lieu of a more specific provision

allowing termination for disability. In *Oster v. Baack*, the Colorado Court of Appeals

answered this question in the negative:

> Here, Baack's employment agreement set forth several ways in which her
> employment could be terminated. As pertinent here, one way was 'for
> cause' if Baack failed to maintain the 'necessary requisite' of an
> unrestricted medical license. Another was for a disability if Baack could
> not perform her duties, including maintaining an unrestricted medical
> license, for one year.
>
> In our view, Oster and Horizon did not have the option to proceed under
> the 'for cause' provision but were required to proceed under the disability
> provision.

(*Oster v. Baack*, 2012 Colo. App. LEXIS 777, 10-11 (Colo. App. No. 11CA0368, May 10,

2012) (not published pursuant to C.A.R. 35(f)) (*Baack I*).

The holding in *Baack I* was reiterated in *Oster v. Baack*, 351 P.3d 546, 547-48

(Colo. App. 2015) (*Baack II*), where the Colorado Court of Appeals summarized its prior

holding that it: "(1) reversed the part of the [trial court] judgment concluding that Baack's

employment could be considered terminated 'for cause'; (2) determined, as a matter of

law, that Baack had to be considered terminated for 'disability' rather than 'for cause';

and (3) remanded the case for entry of an order requiring Oster and Horizon to pay

Baack the full value of her interest in Horizon."

The *Baack I & II* case holdings are applicable in this case. Dr. Green's

Employment Agreement provides for termination upon disability of a physician.

(Physician-Partner Employment Agreement, Defendants' Ex. A, Section 6.2.4). The

Employment Agreement also provides for termination for specific breaches, although

none include Section 2.4. (*Id.* at Section 6.2.2). As the Colorado Court of Appeals found

in the above cases, despite the loss of required licensure or privileges, the disability

provision is the more specific controlling provision under the circumstances. Dr. Green's loss of facility privileges is the direct result of the Colorado Medical Board suspension action and his disability status, and his termination from partnership was, thus, due to his disability. Defendants' failure to exercise any termination provision under Section 6 of the Employment Agreement, let alone Section 6.2.4, is a breach of contract entitling Dr. Green to recover his forfeited stock and be awarded damages in an amount to be proven at trial.

### c. Defendants Waived the Affirmative Defense of Prior Material Breach

The defense of "excused performance" resulting from a party's prior material breach is an affirmative defense and, as such, it must be pled or it is waived. *See Shelter Mortgage Corp. v. Castle Mortg. Co., LC*, 117 Fed.Appx. 6, 11 (10th Cir. 2004). Neither Defendants' Answer to Plaintiff's Complaint nor their Answer to Plaintiff's First Amended Complaint contain this affirmative defense. It is, thus, undisputed that the defense of prior material breach was not pled by Defendants at any point during this case until it was raised in Defendants' Motion for Summary Judgment.

In *Shelter Mortgage Corp.*, the Tenth Circuit rejected a "prior material breach" affirmative defense finding that it had been waived because the appellant failed to give proper notice to the appellee of the alleged breach in the litigation before the appeal. *Shelter Mortgage Corp.*, 117 Fed.Appx. at 12.   Even assuming that prior notice was given, the facts viewed in the light most favorable to the non-moving party evidence that Defendants ratified the Physician-Partner Employment Agreement in March 2016 when the parties duly signed a letter upon Dr. Green's return to work after his medical leave,

and expressly referenced the Physician-Partner Employment Agreement. (Defendants' Ex. D).

Thereafter, it is undisputed that Dr. Green performed consistent with this letter and reapplied for privileges at HealthONE, Centura, Exempla Saint Joseph Hospital, and Rose Hospital.  As of August 2016, Dr. Green held credentials at Exempla Saint Joseph Hospital, The Medical Center of Aurora, Park Avenue Surgery Center, Highline Surgery Center, and Crown Point.

It was Defendants, however, who breached the Physician-Partner Employment Agreement by paying Dr. Green on an hourly basis upon his return to work in March 2016. Defendants further breached the Agreement by terminating the Physician-Partner Agreement in August 2016 in violation of the CGB Charter expressly incorporated into the Agreement and not through any defined termination event in Section 6 of the Agreement.

### d.   *Any Ambiguity in the Agreement is a Question of Fact.*

If a contract is so plain that no reasonable person could hold it any way but one, then the court may interpret the meaning as a matter of law. If, however, a court concludes that a contract is reasonably and fairly susceptible to two different constructions, an ambiguity exists. *U.S. Fidelity & Guaranty Co. v. Guenther*, 281 U.S. 34, 37 (1930).   Here, the central language in dispute under Section 2.4(ii) of the Employment Agreement is the phrase "Facility or Facilities to which the physician is assigned." Because the capitalized terms are not defined in the Agreement and, as

discussed in Section 2 *supra*, can have different constructions, the contractual interpretation question is one of fact, which should go to a trial.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff Richard Brandt Green, M.D. has come forward with sufficient evidence, taken in the light most favorable to him, to establish all of the challenged elements of his claims, and the Defendants' request for summary judgment on those claims should be denied. Further, Defendants waived their after-the-fact affirmative defense of material breach of contract and summary judgment on such defense should be denied.

Respectfully submitted this 27th day of December 2021.

THE WORKPLACE COUNSEL

*s/ Jennifer L. Gokenbach*
Jennifer L. Gokenbach
Stephen B. Rotter
1401 Lawrence Street, Suite 1600
Denver, Colorado 80202
Tel: 303-625-6400
jennifer@theworkplacecounsel.com
stephen@theworkplacecounsel.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 27th day of December, 2021, I electronically filed the foregoing **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

<em>s/ Jennifer L. Gokenbach</em>
Jennifer L. Gokenbach